18

> **FILED**
> MAR 3 0 2011
> UNITED STATES BANKRUPTCY COURT
> EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

<u>NOT FOR PUBLICATION</u>

UNITED STATES BANKRUPTCY COURT
EASTER DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re | Case Number 08-13738-B-7 |
| Lloyd Preston Lister and Linda Lister, | |
| Debtors. | |
| Robert A. Hawkins, Chapter 7 Trustee of the Estate of Lloyd & Linda Lister, | Adversary Proceeding No. 09-1140 |
| Plaintiff, | |
| v. | |
| Lowell Elmer Lister and Wilma Kay Chapman, | |
| Defendants. | |

**MEMORANDUM DECISION REGARDING COMPLAINT FOR AVOIDANCE OF FRAUDULENT TRANSFER; DECLARATORY RELIEF, AND SALE OF CO-OWNED REAL PROPERTY**

This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

Beth Maxwell Stratton, Esq., of The Stratton Law Firm, appeared in her capacity as the chapter 7 trustee for the estate prior to the appointment of Robert A. Hawkins as her successor (see footnote 1 below).

Scott Lyons, Esq., appeared on behalf of the defendants, Lowell Elmer Lister and Wilma Kay Chapman.

82

1    Before the court is an adversary proceeding in which the chapter 7 trustee,

2  Robert A. Hawkins ("Trustee")[1] seeks to avoid the prepetiton transfer of an interest

3  in real property made by the debtor, Lloyd Lister ("Lloyd" or "Debtor") to the

4  defendants, Lowell Lister and Wilma Chapman ("Lowell" and "Wilma,"

5  respectively; collectively "Defendants").  The Trustee also seeks a declaration and

6  turnover of the bankruptcy estate's interest in rents which Lowell collected from the

7  subject property and an order authorizing a sale of the property pursuant to 11

8  U.S.C. § 363(h).  The Trustee asserts that the property was transferred in

9  anticipation of this bankruptcy filing with actual intent to hinder, delay, and defraud

10  the Debtor's creditors.  The Trustee also contends that Lloyd did not receive

11  reasonably equivalent value for giving away his interest in the property at a time

12  when he was insolvent.  The Defendants contend that value was given in the form of

13  care for Lloyd, Lowell and Wilma's father in the years prior to his death.  For the

14  reasons set forth below, judgment will be entered in favor of the Trustee.

15    This memorandum decision contains findings of fact and conclusions of law

16  required by Federal Rule of Civil Procedure 52 (made applicable to this adversary

17  proceeding by Federal Rule of Bankruptcy Procedure 7052).[2]  The bankruptcy court

18  has jurisdiction over this motion pursuant to 28 U.S.C. §§ 1334 and 157, 11 U.S.C.

19  §§ 363 and 548, and General Orders 182 and 330 of the U.S. District Court for the

20  Eastern District of California.  This is a core proceeding pursuant to 28 U.S.C.

21  _____

22    [1]On November 5, 2010, after the trial in this adversary proceeding, the original
    plaintiff, Beth Maxwell Stratton, resigned from the chapter 7 trustee's panel.  The U.S.
23  Trustee appointed Robert A. Hawkins ("Hawkins") as her successor.  On March 8, 2011, this
    court entered an order substituting Hawkins as the named Plaintiff in this adversary
24  proceeding.

25
    [2]Unless otherwise indicated, all chapter, section and rule references are to the
26  Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy
    Procedure, Rules 1001-9036, as enacted and promulgated *after* October 17, 2005, the
27  effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005,
    Pub. L. 109-8, Apr. 20, 2005, 119 Stat. 23.
28

2

1    subsections 157(b)(2)(A), (H) (N) and (O).

2    **Background and Findings of Fact.**

3        **The Property.** The facts of this adversary proceeding are substantially

4    undisputed. The subject of this litigation is a parcel of real property located at 3481

5    and 3483 Orange Drive in Oxnard, California (the "Property"). The Property is

6    improved with two single-family residential structures which are physically situated

7    in a manner which would make division of the Property into separate parcels

8    prohibitively difficult and expensive. The parties stipulated, for purposes of this

9    adversary proceeding, that the fair market value of the Property was $395,000 as of

10    May 2008, the month in which Lloyd signed and recorded a deed to convey his one-

11    third interest in the Property to the Defendants. At that time there were no

12    encumbrances against the Property.

13        The Property sits in an unincorporated area of Ventura County. The

14    surrounding neighborhood is composed of single family residences. The Property

15    covers approximately 21,000 square feet. Based on the zoning, the minimum lot

16    size in that area is 10,000 square feet. The two residential structures located on the

17    Property are situated such that the Property cannot be divided into 10,000 square

18    foot parcels and still comply with the minimum clearance mandated by the zoning.

19    Each house on the Property produced $1,200 per month of rent and both houses

20    have been rented continuously to the same tenants. Lowell has collected the rental

21    proceeds from the Property since the early 1990s. He used some of that money to

22    pay for his Father's care so that his Father would not have to go to a rest home.

23    Lowell also used some of the rental proceeds to pay for the taxes, insurance, and

24    maintenance of the Property.

25        **The Listers' Father.** The Defendants in this adversary proceeding are

26    Lloyd's brother and sister. Prior to November 25, 1997, the Property belonged to

27    their father, Lowell E. Lister (the "Listers' Father" or "Father"). On that date, the

28    Listers' Father executed a quitclaim deed conveying all of his interest in the

3

1    Property to Lloyd and the Defendants, to hold equally as joint tenants. The 1997

2    quitclaim deed bore the note, "This is a gift from parent to children no money

3    exchanged." At that time, the Listers' Father was about 80 years-old.

4         Lowell began taking care of his Father in 1992. Sometime after that, the

5    Listers' Father gave Lowell title to a nearby property located at 3471 Orange Ave.

6    as consideration for Lowell's commitment to care for him.[3] The evidence suggests

7    that Lowell did a wonderful job caring for his Father. The Listers' Father was

8    living alone and could not care for himself. Lowell traveled to his Father's house

9    every day to feed him and attend to his needs. Presumably, Lowell also managed all

10   of his Father's financial affairs. By the time of his death, the Listers' Father was 90

11   years-old, he could not drive, he was functionally blind, he had suffered two heart

12   attacks, and had undergone the replacement of both knees and a hip.

13        In about 1998, the Listers' Father moved into Lowell's house and lived there

14   until his death. Thereafter, the need for care consumed a significant amount of

15   Lowell's time and emotional energy. Lowell was trying to run a small business at

16   the time. Lowell's wife assisted when she could with activities such as taking the

17   Listers' Father to the doctor. There is no evidence to suggest that either Lloyd, or

18   Wilma assisted Lowell and his wife, or participated to any significant degree in

19   caring for their Father.

20        **The 2008 Grant Deed.** This adversary proceeding concerns a transaction

21   involving the Property, which occurred about one month after the Listers' Father

22   death. On May 19, 2008, Lloyd executed a grant deed to convey his one-third

23   interest in the Property to the Defendants, to hold as joint tenants (the "2008 Grant

24

25   _____

26        [3]The testimony reveals that Lowell also acquired title to two other parcels of property
     located in the same neighborhood at 3467 and 3469 Orange Ave. from the Listers'

27   grandmother sometime prior to her death more than five years ago. The record is silent as to
     why Lloyd and Wilma did not receive a share of their grandmother's property. Lowell has

28   been collecting the rental proceeds on those properties.

                                          4

1    Deed"). The Debtor effectively transferred a one-sixth interest in the Property to

2    each Defendant. The 2008 Grant Deed states on its face that it was given as a

3    "gift," such that no transfer tax would be paid to the County. The 2008 Grant Deed

4    was recorded on May 27, 2008. Based on the information in the Debtor's

5    bankruptcy schedules, and the absence of any contrary testimony, the Trustee has

6    established that Lloyd was insolvent at that time within the meaning of the

7    Bankruptcy Code.[4]

8         There is no dispute that Lloyd received nothing in the way of remuneration or

9    tangible consideration for executing the 2008 Grant Deed. The Defendants contend

10   that the 2008 Grant Deed was given to satisfy Lloyd's moral commitment to Lowell

11   and to compensate Lowell for the care of their Father. Lloyd also testified that he

12   executed the 2008 Grant Deed to fulfill a purported agreement he had made with

13   Lowell ten years earlier, an agreement that Lowell could have Lloyd's interest in the

14   Property to compensate Lowell for taking care of their Father. This "agreement" is

15   evidenced by a typewritten document (defendants' exhibit "D") dated February 12,

16   1999, which was prepared by Lloyd (the "1999 Agreement"). The Listers' Father

17   was never told about the 1999 Agreement. The complete text of the 1999

18   Agreement is set forth below:

19        This agreement is between Lowell Lister and Lloyd Lister regarding
          the care and welfare of our father. At this time his second wife has
20        left him to live with her daughter because she can no longer care for
          herself or our father. Lowell Lister has agreed to handle all our
21        father['s] needs while he remains living in his own home. The
          arrangement will be our father will eventually have to move in with
22        Lowell Lister and avoid our paying for rest home care. Lloyd Lister is
          in turn going to deed his one half interest in the property located at
23        3481 Orange Dr.[,] Oxnard, CA[,] to Lowell Lister in exchange for
          the costs of all future expenses Lowell Lister incurs. Our sister Wilma
24        Chapman's one half interest in the property will remain the same.

25        The Trustee disputes the authenticity and the enforceability of the 1999

26

27   _____

28        [4]In the interest of brevity, the court adopts the Trustee's analysis of the schedules as
     support for the "insolvency" finding. The issue was essentially undisputed at trial.

5

Agreement. The 1999 Agreement contains several factual errors and ambiguities which Lloyd could not explain. It states that the Listers' Father would "eventually" move in with Lowell, even though Lowell testified that his Father had already moved into Lowell's home in 1998. The 1999 Agreement was not drafted as a conveyance of the Property. It is worded as a future promise to convey the Property. The promise was made "in exchange for the costs of all future expenses" Lowell would incur in caring for their Father. However, the 1999 Agreement is silent as to what those "future expenses" might include and it is not clear why Lloyd promised to compensate Lowell for *all* such expenses rather than a one-third share. Further, Lowell testified that he had collected and used the rental proceeds from the Property to pay for his Father's care since the early 1990s. There was no evidence introduced to show that Lowell personally incurred any expenses in caring for his Father, or that his Father's expenses were not fully covered by the rental proceeds, by his Father's assets, and by government assistance programs such as Social Security, Medicare and Medi-Cal.

Lloyd could not explain why the 1999 Agreement refers to Lloyd's and Wilma's *one-half interest* in the Property when, in fact, they only held a one-third interest. The 1999 Agreement contemplates a transfer to Lowell, however, the 2008 Grant Deed was given to both Lowell and Wilma. Finally, the 1999 Agreement appears to relate only to the residential structure which bears the "3481 Orange Dr." address. The Property has two structures with two addresses. Lloyd was unable to explain any of these discrepancies.

Perhaps the most significant flaw in the 1999 Agreement is the fact that it makes no reference to compensating Lowell for his personal services. It refers only to compensation for Lowell's expenses. The Defendants argue in their closing brief that compensation was given for the 2008 Grant Deed in the form of Lowell's services. However, by its own terms, the 1999 Agreement is not applicable to Lowell's personal service.

6

1    **Lloyd's Bankruptcy.** This bankruptcy was filed as a joint petition by Lloyd
2    and his wife on June 27, 2008, exactly one month after the 2008 Grant Deed was
3    recorded. Based on the Debtor's schedules, he had assets totaling $432,115 and
4    liabilities totaling $800,709. Based on schedule I, the Debtor reported a monthly
5    income of $419 from Lister Auto Repair. His wife was drawing $1,200 per month
6    of unemployment benefits. Their combined income was $1,619 per month against
7    expenses reported to be $3,162 per month. The transaction involving the 1998
8    Grant Deed is disclosed in the Debtors' statement of financial affairs as a transfer to
9    Lowell Lister of a "1/3 interest in real property located in Ventura County."
10       Prior to the bankruptcy, Lloyd had been involved in several business
11    ventures, including a business known as XLNT Auto Sales ("XLNT"). In 2006,
12    Lloyd was sued in the Fresno County Superior Court by John Miller ("Miller"), who
13    had a connection with Lloyd through the XLNT enterprise. In November 2007,
14    Miller obtained a judgment against XLNT and personally against Lloyd in the
15    amount of $50,000. In March 2008, two months before the 2008 Grant Deed was
16    executed, Miller's judgment was amended and increased to $85,000. Lloyd never
17    personally paid anything toward the judgment. However, Lloyd's statement of
18    financial affairs states that Miller had begun executing on the judgment.[5]
19       The 1999 Grant Deed was not the only transfer which Lloyd made shortly
20    before his bankruptcy. On June 16, 2008, eleven days before filing his bankruptcy
21    petition, Lloyd executed a deed of trust against some commercial property located

---

24    [5]The Debtor's response to question number 4 on the statement of financial affairs
25    states that in December 2007, Miller executed a levy on the XLNT bank account in the
      amount of $25,000.

26       Miller filed a proof of secured claim in the amount of $64,475.06. On September 4,
27    2008, Miller filed a complaint to deny Lloyd's discharge under § 727. On February 17,
      2011, after a trial, this court entered a judgment denying Lloyd's discharge (adversary
28    proceeding number 08-1201).

7

on Minnewawa Avenue, in Clovis, California, in favor of his Aunt and Uncle Glen and Imogene Hartwell (plaintiff's exhibit 7; the "Hartwell Trust Deed"). The Hartwell Trust Deed was given to secure a debt which Lloyd had owed to his aunt and uncle for several years. At trial, Lloyd authenticated his signature on the Hartwell Trust Deed, but was unable to explain the reason for its existence. The Hartwell Trust Deed was not disclosed in the Debtor's bankruptcy schedules. The Hartwells are listed in schedule F as unsecured creditors with a $100,000 claim based on a "2005 loan." The Minnewawa property is listed in schedule A with the notation "Lost to investors, February 2008."

**Issues Presented.**

The Trustee contends that the 2008 Grant Deed was a fraudulent transfer within the meaning of subsections 548(a)(1)(A) & (B). Based on the information contained in the Debtor's schedules, it appears that Lloyd was insolvent at the time he executed and recorded the 2008 Grant Deed. To prevail, the Trustee must show, *inter alia*, that Lloyd gave away his interest in the Property with actual intent to hinder, delay, or defraud any entity, and/or without receiving reasonably equivalent value. The Defendants deny that there was any fraudulent intent and contend that the 2008 Grant Deed was given to satisfy Lloyd's moral obligation to Lowell and commitment as evidenced by the 1999 Agreement. They contend that the years of care Lowell gave to the Listers' Father constituted reasonably equivalent value for the exchange.

If the Trustee prevails on the fraudulent transfer claim, then the court must also decide the appropriate remedy under § 550. The court may avoid the 2008 Grant Deed and restore Lloyd's interest in the Property to the bankruptcy estate, or the court may enter a money judgment against the Defendants for the value of the Debtor's interest in the Property.

If the Trustee prevails on the fraudulent transfer claims, two other issues flow from the facts; (1) may the Trustee sell the Property free and clear of the

8

1   Defendants' joint interest, to liquidate and recover the bankruptcy estate's share of

2   the Property for the creditors pursuant to subsection 363(h), and (2) does the Trustee

3   also have a right to recover Lloyd's share of the rental proceeds which Lowell

4   collected from the Property.

5   **Analysis and Conclusions of Law.**

6       **Avoidance of a Transfer Under § 548**.  The Trustee brought this adversary

7   proceeding pursuant to § 548(a) stating claims for relief under both subsections

8   548(a)(1)(A) and 548(a)(1)(B).  Section 548(a) vests the Trustee with the power to

9   avoid actually and constructively fraudulent transfers occurring within two years of

10  bankruptcy by providing, in pertinent part, as follows:

11          (a)(1) The trustee may avoid any transfer . . . *of an interest of*
            *the debtor in property*, or any obligation . . . incurred by the
12          debtor, that was made or incurred on or *within two years before*
            *the date of the filing* of the petition, if the debtor voluntarily or
13          involuntarily–

14              (A) made such transfer or incurred such
                obligation with *actual intent to hinder, delay, or*
15              *defraud any entity* to which the debtor was or
                became, on or after the date that such transfer
16              was made or such obligation was incurred,
                indebted; or
17
                (B)(i) *received less than a reasonably equivalent*
18              *value in exchange for such transfer or obligation*;
                and
19
                (ii)(I) was *insolvent on the date that such transfer*
20              was made or such obligation was incurred, or
                became insolvent as a result of such transfer or
21              obligation[.] (Emphasis added.)

22  "[T]he policy behind section 548 is to preserve assets of the estate." *Wyle v.*

23  *C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 597 (9th Cir.

24  1991) (citation omitted).  The court's mission here is to determine whether

25  avoidance of the 2008 Grant Deed would create an asset that can be distributed to

26  unsecured creditors.  The Trustee has the burden of establishing the existence of the

27  elements of a voidable transfer under section 548.  5 *Collier on Bankruptcy*

28  (Sixteenth Ed.) ¶ 548.11, pg. 548.103.

9

For the purposes of interpreting § 548, a "transfer" of property is defined in § 101(54)(D) to mean "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property." A transfer of property is made at the time the transfer is perfected against a bona fide purchaser under applicable state law. § 548(d)(1). Here, the Trustee seeks to avoid the transfer of property which occurred by virtue of the 2008 Grant Deed. There is no dispute that Lloyd had a one-third interest in the Property prior to the transfer. The "transfer" occurred within two years prior to the bankruptcy. For purposes of § 548, the transfer occurred on May 27, 2008, the date on which the 2008 Grant Deed was recorded.

**The Debtor Did Not Receive Reasonably Equivalent Value for His Interest in the Property.** The analysis of "reasonably equivalent value" requires a comparison of the value of the property interest that the Debtor gave up with the value of the property that the Debtor received. *Southmark Corp. v. Riddle (In re Southmark Corp.)*, 138 B.R. 820, 829 (Bankr. N.D. Tex. 1992) *(citing In re Grabill Corp.)*, 121 B.R. 983, 994 (Bankr. N.D. Ill. 1990).

"In determining whether a transfer has been for an exchange of reasonably equivalent value, the court analyzes all the circumstances surrounding the transfer." *In re 3dfx Interactive, Inc.*, 389 B.R. 842, 862 (Bankr. N.D. Cal. 2008) (citation omitted). "Because the policy behind fraudulent conveyance law is to preserve assets of the estate, reasonably equivalent value is determined from the standpoint of the estate's creditors, it is not determined from the defendant's perspective." *Id.* at 863 (citations omitted). The question of reasonably equivalent value is answered by looking at the totality of the circumstances, and is left to determination by the courts. There are no hard and fast rules for determining what does constitute reasonably equivalent value. *Id.*

To begin, there is no dispute that the Debtor received nothing from Wilma in exchange for the one-sixth interest she received by virtue of the 1998 Grant Deed.

10

The Defendants presented no evidence and made no arguments to explain why Lloyd gave Wilma a share of his interest in the Property. That alone entitles the Trustee to a judgment against Wilma under subsection 548(a)(1)(B).

With regard to the one-sixth interest Lowell received, the Defendants argue that Lowell's long years of service in caring for their Father satisfies the "reasonably equivalent value" factor. Lloyd did not help care for his Father, or pay for the care of his Father, and was under no legal obligation to do so. Lowell's service to their Father did not benefit Lloyd in the sense of satisfying any legal duty or antecedent debt. Understandably, Lloyd may have felt some moral obligation to Lowell for his family devotion. However, under California law, a moral obligation, by itself, is not consideration for a fraudulent transfer. *In re Prejean*, 994 F.2d 706, 708 n.4 (9th Cir. 1993). "If it were, variant and variable concepts of morality could render any promise enforceable." *Id.* (citation omitted).

Notwithstanding the fact that Lowell apparently did an excellent job caring for the Listers' Father, there was absolutely no evidence introduced at trial to establish a value for Lowell's service to their Father. There is no authority under which Lowell could have sued his brother and sister for compensation after their Father died. Further, the evidence suggests that Lowell did receive compensation *from his Father*. Prior to his Father's death, Lowell was given a deed to the property at 3471 Orange Ave. as consideration for his commitment to care for the Listers' Father. While caring for his father, Lowell collected the rental revenue from all of the properties he was in control of and enjoyed the economic benefits of those properties.

The Defendants argue in their post trial brief that intangible services do have a value, under state law, for purposes of § 548(a)(1)(B), just as money and tangible goods have value. They cite *Annod Corporation v. Hamilton & Samuels*, 100 Cal.App.4th 1286, 1295-97 (2002) in support of their argument. *Annod* was a case in which a commercial landlord sued the partners of a failed law firm for past due

11

rent. The landlord sought damages under a fraudulent conveyance theory contending that the partners drained the law firm of its assets by taking income draws instead of paying the rent. The court found that the law firm owed money to the partners, for the legal services they had rendered to the law firm, and the compensation was paid in satisfaction of that antecedent debt. The legal services had a substantial value, but they were also provided to the same entity from which the partners received the compensation.

The court takes no issue with the proposition that Lowell's services in caring for the Listers' Father had a substantial value, but the distinguishing factor here is the fact that the economic value of Lowell's services flowed *to the Listers' Father*, not to Lloyd, or to Wilma for that matter. Lloyd's execution of the 1998 Grant Deed diminished his personal asset base by at least $131,667 without satisfying any antecedent debt owed to the recipients. There was no offsetting reduction on the liability side of Lloyd's "balance sheet." Lloyd received nothing from Lowell with which Lloyd could pay his creditors. Accordingly, the court is persuaded that Lloyd did not receive "reasonably equivalent value" for his interest in the Property when he gave it to the Defendants in 2008.

Before leaving this topic, the court is compelled to address the 1999 Agreement. There is no evidence that Lowell detrimentally relied upon the 1999 Agreement, or any other promise from Lloyd in his decision to care for their Father. Further, the 1999 Agreement is so poorly drafted and ambiguous that the court cannot give it any legal effect here. Lloyd's execution of the 2008 Grant Deed, giving a one-third interest to both Lowell and Wilma, appears to bear little or no relationship to the 1999 Agreement which contemplates the giving of a one-half interest solely to Lowell. The 1999 Agreement contemplates compensation to Lowell for his "costs and expenses." However, there was no evidence that Lowell personally incurred any costs and expenses in caring for his Father.

/ / /

12

**The 1998 Grant Deed Was Given With Actual Intent to Hinder, Delay,**

**and Defraud Creditors.** Finally, the Trustee contends that Lloyd gave away his

interest in the Property in anticipation of the bankruptcy filing and with actual intent

to hinder, delay, and defraud his creditors. Whether the Debtor acted with intent to

hinder, delay, or defraud is a question of fact. *In re Sholdan*, 217 F.3d 1006, 1010

(8th Cir. 2000). If property is transferred with actual fraudulent intent, then the

questions of "reasonably equivalent value" and insolvency, while still relevant as

possible "badges of fraud," are not required as elements of a claim under subsection

548(a)(1)(A).

Because it is often impossible to show a subjective intent to hinder, delay, or

defraud creditors, courts frequently infer fraudulent intent under §548(a)(1)(A) from

the circumstances surrounding the transfer. "[T]he finding of the requisite intent

may be predicated upon the concurrence of facts which, while not direct evidence of

actual intent, lead to the irresistible conclusion that the transferor's conduct was

motivated by such intent." 5 *Collier on Bankruptcy* (Sixteenth Ed.), ¶548.04[2][a],

pg. 548-46.

Here, looking at all of the circumstances, the court is left an unshakable

conviction that (1) the Debtor was in serious financial difficulty and knew that he

was going to have to seek relief in the bankruptcy court, and (2) the Debtor

transferred his interest in the Property to the Defendants in an effort to shelter it

from the bankruptcy.

The 2008 Grant Deed states on its face that it was given as a "gift" meaning

for no consideration. The 2008 Grant Deed was not given contemporaneously with

Lowell's commitment to care for the Lister's Father, it was given years later, after

the Father's death. It was recorded exactly one month before the bankruptcy

petition was filed. At the time, the Debtor was already insolvent and unable to pay

his debts. Lloyd was drawing very little income and living primarily on his wife's

unemployment benefits. He had recently suffered a judgment in favor of Miller in

13

the state court. Miller had already started executing on the judgment by levying against the Debtor's business accounts. The Debtor knew he had to seek bankruptcy protection and he executed the 2008 Grant Deed in preparation for that event. When he did give away his interest in the Property, he received nothing in exchange from which he could pay creditor claims. The Property was not the only asset the Debtor tried to give away in preparation for the bankruptcy. Eleven days before the bankruptcy was filed, he gave away the Hartwell Trust Deed to secure a years-old loan obligation to another family member. He then failed to properly disclose that transaction on his bankruptcy schedules for reasons which he could not adequately explain at trial.

**The Choice of Remedies Under Subsection 550(a).** Once the court determines that the Trustee is entitled to avoid a fraudulent transfer of property, the court must decide the appropriate remedy. That choice is governed by § 550(a), which provides in pertinent part:

"[T]o the extent that a transfer is avoided under section . . . 548 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from [the Defendants]"

Section 550 "enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee." 5 *Collier on Bankruptcy* (Sixteenth Ed.), ¶550.01, pg. 550-3 (citations omitted). "The particular theory under which the transfer has been avoided is, for all intents and purposes, irrelevant to the liability of the transferee against whom the trustee claims recovery of the property." *Id.*

Here, the "avoided" transfer was a one-third interest in real property. The parties have stipulated that the applicable value of the Property was $395,000, which would make the bankruptcy estate's share worth $131,667. The Trustee has requested a judgment returning Lloyd's interest to the bankruptcy estate so it can be liquidated for the benefit of creditors pursuant to § 363(h) (see discussion infra). There is no evidence to suggest that the Property has been destroyed, or encumbered

14

with debt, or that sale of the Property and division of the proceeds would not lead to a fair result for all parties.  Further, there is no evidence to suggest that the Trustee could ever recover a money judgment from the Defendants, without having to liquidate the Property, or similar assets, in execution of the judgment.  That remedy would certainly cause unnecessary expense and delay for the estate.   Based thereon, the court is persuaded that the appropriate remedy here is to avoid the 2008 Grant Deed and return Lloyd's one-third share of the Property to the bankruptcy estate.

**Sale of the Co-Owned Property Pursuant to Subsection 362(h).**  Once it is determined that the Trustee may recover the Debtor's interest in the Property for the benefit of the bankruptcy estate, the court must determine the best way to liquidate that interest for the benefit of the creditors.  When the bankruptcy estate only holds a partial interest in property, either as a tenant-in-common or joint tenant, Code § 363(h) allows the trustee to sell the entire property, provided the trustee can show that; (1) division of the property among the interest holders is impracticable; (2) sale of the estate's interest alone would result in a significantly smaller return for the estate than would a sale of the entire property; (3) the benefit to the estate from sale of the entire property outweighs the detriment, if any, to the co-owners; and (4) the property is not used in the production, transmission, or distribution, for sale, of electrical energy or natural gas for heat, light or power.  The trustee's power to sell co-owned property under § 363(h) applies to property recovered through the trustee's avoiding powers and § 550. *Behm v. Bell (In re Bell)*, 80 B.R. 104, 105 (Bankr. M.D. Tenn. 1987).

Here, the Trustee offered unrebutted evidence to show that the Property could not be partitioned among to co-owners to give each an equivalent share.  The physical location of the structures on the Property precludes division of the Property

15

in compliance with the applicable zoning regulations.[6] The Trustee also established
that sale of the Debtor's undivided interest alone, if it could be sold at all, would
result in a substantially smaller return to the bankruptcy estate. Indeed, the parties
stipulated to that fact during the trial. The Property is not the Defendants' residence
and sale of the Property would not result in a dislocation or hardship to the
Defendants other than loss of the rental income which Lowell is collecting.
Accordingly, the court is persuaded that a sale of the Property would not impose any
significant hardship to the Defendants. The fourth element for sale under § 362(h)
relates primarily to utility companies and is not applicable here.

      **The Bankruptcy Estate's Interest in the Rent Proceeds.** Since April
2008, Lowell has been collecting and keeping rental revenue from the Property in
the amount of $2,400 per month. As a co-owner of the Property, the Debtor had a
right to receive one-third of those rents, or about $800 per month. When the Debtor
executed the 2008 Grant Deed, he not only gave away his interest in the Property,
but he also abandoned his interest in the rents that had been collected and the right
to receive future rents. The evidence does not support a finding that Lloyd gave
away his interest in the rents with fraudulent intent. Indeed, it appears that Lloyd
never really thought about or asserted an interest in the rents, they were always
collected by Lowell. However, for the reasons discussed above, the Debtor did not
receive reasonably equivalent value in exchange for giving away or abandoning that
income stream. The transfer of the Debtor's interest in the rents is therefore
avoidable and the Trustee is entitled to recover one-third of the rent proceeds or
other property of equivalent value.

      Of course, as a co-owner of the Property, Lloyd would also have been

---

[6]The Defendants argued at trial that the Property has already been subdivided into
two parcels, but there was no evidence to establish that fact. Even if that were so, with only
two structures on the Property, further division into three equivalent shares would appear to
be impossible.

16

1  responsible for one-third of the taxes and expenses associated with the Property.
2  There was testimony from Lowell that he had used some of the rent proceeds to pay
3  for those expenses.  In addition, there was testimony that Lowell had paid some of
4  the rents to or for the benefit of the Debtor in the form of cash to pay legal fees.
5  Needless to say, if Lowell paid expenses for the Property, or gave some of the rents
6  to the Debtor, those amounts should be accounted for and appropriate adjustments
7  are warranted.  However, neither party presented an accounting of the rents and
8  litigation over the rents was unnecessary unless and until the court ruled in favor of
9  the Trustee with regard to the Property.

10      Pursuant to Federal Rule of Civil Procedure 54(a) (made applicable to this
11  adversary proceeding by Fed.R.Bankr.P. 7054), the court may enter a final judgment
12  on less than all of the claims and issues if it finds there is no just reason to delay
13  entry of such a judgment before all of the issues are resolved.  Here, there is no just
14  reason to delay the Trustee's ability to recover and market the Property until a final
15  accounting of the rents is resolved.  The parties may proceed with discovery relating
16  to the rents and operating expenses for the Property.  If it is determined through
17  further litigation that "net" rents exist for recovery from the Defendants, that can be
18  resolved through entry of a subsequent monetary judgment.  Alternatively, the court
19  can make an appropriate "adjustment" or offset to compensate the estate from the
20  Defendant(s) share(s) of the sale proceeds from the Property.

21  **Conclusion.**

22      Based on the foregoing, the court finds and concludes that the Debtor, Lloyd
23  Lister, transferred his interest in the Property to the Defendants, Lowell Lister and
24  Wilma Chapman in anticipation of the bankruptcy and with actual intent to hinder,
25  delay, and defraud his creditors.  Lloyd also transferred his interest in the Property
26  to the Defendants at a time when he was insolvent without receiving reasonably
27  equivalent value from either Defendant in exchange for the transfer.  The transfer is
28  therefore avoidable pursuant to 11 U.S.C. subsections 548(a)(1)(A) & (B).  The

17

1   court is persuaded that recovery of Lloyd Lister's interest in the Property for the

2   estate, as opposed to a money judgment for one-third of its value, is the appropriate

3   remedy pursuant to subsection 550(a)(1). Accordingly, the 1998 Grant Deed will be

4   avoided.

5          The court also finds and concludes that the conditions for sale of the Property

6   pursuant to § 363(h) have been satisfied. The Trustee may therefore proceed to sell

7   the Property, including the Defendants' interest in the Property. After discovery and

8   a further hearing, if necessary, the net proceeds will be divided with the Defendants

9   in compliance with California law.

10         With regard to the rental revenue which Lowell has collected from the

11  Property, the court finds and concludes that the Debtor also abandoned and

12  conveyed away his one-third interest in that income stream without receiving

13  reasonably equivalent value. The Trustee is entitled to recover the Debtor's one-

14  third interest in the "net" rents. An accounting of those rents, and the expenses paid

15  to maintain the Property, will require a subsequent evidentiary hearing after which

16  the Trustee will be entitled to either (1) a money judgment, or (2) a charge against

17  the Defendant(s) share(s) of the proceeds after sale of the Property.

18         The court concludes that there is no just reason to delay entry of a final

19  judgment on the §§ 548, 550 and 363(h) claims relating to recovery of the Property

20  so that the Trustee may proceed with liquidation of the Property. Bifurcation of the

21  "rent" accounting and division of the proceeds is appropriate pursuant to Federal

22  Rule of Bankruptcy Procedure 54(b). Once the Property is liquidated, and the costs

23  of sale are paid, the court will set a schedule for the completion of discovery and a

24  trial, if necessary, to determine how the "net" sale proceeds and rental proceeds

25  should be divided. The Trustee shall submit a proposed judgment.

26         Dated: March ___30___, 2011

27

28                                          W. Richard Lee
                                            United States Bankruptcy Judge

                                     18